**IN THE UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| **v.** | **:** | **CRIMINAL NO. 24-3-2** |
| **AMIN MUSE** | **:** | |

# GOVERNMENT'S SENTENCING MEMORANDUM

## I. PROCEDURAL BACKGROUND

On July 24, 2024, a grand jury returned a 70-count Superseding Indictment against the defendants, Mikal McCracken, Amin Muse, Aleem Abdul-Hakim, Dean Fosque, Kavon Coleman, Amadou Moussa, and Davon Squire, arising from a large-scale carjacking conspiracy during which the conspiracy was responsible for approximately 60 gunpoint carjackings. Thirty of the carjackings (including the carjacking/murder) were charged in the Superseding Indictment, as both overt acts in support of the conspiracy and as substantive crimes. The crimes named in the Superseding Indictment involve: a carjacking where the victim was shot and killed; the murder of a witness; 30 additional gunpoint carjackings, including 7 more shootings where 3 victims were actually hit by gunfire during 4 of those 7 shootings (one victim was carjacked and shot twice); a slew of identity thefts; and a scheme to export carjacked and stolen cars for sale in Africa.

Amin Muse was charged in the Superseding Indictment as follows:

> In Count 1, with Conspiracy in violation of 18 U.S.C.§ 371;
>
> In Count 2, with carjacking resulting in death and aiding and abetting in violation of 18 U.S.C.§ 2119(3) and (2);
>
> In Counts 3 and 6, with murder in the course of using and carrying a firearm during and in relation to a crime of violence and aiding and abetting in violation of 18 U.S.C.§ 924(j)(1) and 2;

In Count 4, with conspiracy to tamper with a witness by murder and aiding and abetting, in violation of 18 U.S.C.§ 1512(k) and 2;

In Count 5, with tampering with a witness by murder and aiding and abetting in violation of 18 U.S.C.§ 1512(a)(1)(C), (a)(3)(A) and 2;

In Count 46, 48, 50, 52, 54, 56, and 59, with Carjacking and aiding and abetting in violation of 18 U.S.C. §§ 2119(1) and 2

In Count 47, 49, 51, 53, and 60, with Using, carrying, and brandishing a firearm during and in relation to a crime of violence and aiding and abetting in violation of 18 U.S.C. § 924(c)(1)(A)(ii) and 2;

In Count 57, with carjacking resulting in serious bodily injury and aiding and abetting in violation of 18 U.S.C. § 2119(2) and 2; and

In Count 55, 58, 61 and 62,[1] with Using, carrying, and discharging a firearm during and in relation to a crime of violence, and aiding and abetting in violation of 18 U.S.C. § 924(c)(1)(A)(iii) and 2.

Trial for defendants McCracken, Muse, Abdul-Hakim, Fosque, and Coleman began on January 20, 2026, with jury selection, and included the testimony of over 100 witnesses during an 8-week period. On March 19, 2026, the jury returned a verdict finding all defendants guilty of all counts charged in the Superseding Indictment.

## II. <u>OFFENSE CONDUCT: Amin Muse</u>

The offense conduct is comprehensively summarized in the Presentence Report ("PSR") at ¶¶ 24 – 61. In sum, the defendants engaged in a long-term campaign of violent carjackings that victimized dozens of innocent people, leaving one dead; others wounded by gunfire (one twice, in the same leg, PSR ¶¶ 30, 36, 47); others fired upon; others beaten; and others pistol-whipped.

---

[1] The government has moved to withdraw Counts 61 and 62, as to McCracken, Muse, and Abdul-Hakim, as they are lesser included offenses of Counts 3 and 6, pursuant to *Barrett v. United States*, 607 U.S. 128 (2026) and *Lora v. United States*, 599 U.S. 453 (2023). DI 660. The PSR already took this likelihood into account and did not include the additional 10-year mandatories for Counts 61 and 62 when determining the sentencing guideline ranges. PSR at n. 8. Thus, withdraw of those counts does not affect the guidelines as determined by United States Probation. PSR ¶ 338.

These crimes left all the victims emotionally scarred and financially devastated. Additionally, a second man was murdered simply to eliminate the possibility that he might become a witness against the defendants. At trial, the Court heard testimony from many of the victims who suffered at the hands of the conspirators and often saw victims' first-hand reactions as captured on police body camera video. However, while the government presented testimony concerning thirty-one carjackings, including the murder, the investigation into the conspiracy showed that there were as many as 60 carjackings committed during the life of the conspiracy. PSR¶ 26.

Amin Muse became involved in the carjacking conspiracy in late 2021, after his close friend, Mikal McCracken began to commit carjackings with Jonathan Akubu. Muse was present for every crime committed by Mikal McCracken other than during an approximately month-and-a-half-long period of time when Muse was visiting his family in North Carolina.

Amin Muse personally participated in the carjacking and murder of G.B., the murder of witness A.G., and at least 10 additional non-lethal carjackings as presented through victim and witness testimony at trial. Other than the two murders, two of the non-lethal carjackings in which Muse personally participated also involved shootings.

At trial, the crimes listed in the Superseding Indictment were presented in Groups from A to N. Each group consisted of two to four events and/or crimes. Muse was personally involved in Groups A, B, E, L, M, and N. (Muse was in North Carolina during Groups F through K.) Those incidents in which Muse personally participated will be described below chronologically.

**Group E**

Group E included McCracken's arrest for possessing a stolen firearm, a Glock 9mm handgun, model 17 (serial number AFDG705), on Thanksgiving, November 25, 2021, at Dean

Fosque's father's house. McCracken and Muse were present with others, and they were not allowed to be in that home.

Group E also included the gunpoint carjacking of M.K. and R.T. in the parking lot of the Little Ceasar's at Island and Elmwood Avenues in Philadelphia. (The carjacking of M.K. and R.T. was listed as an overt act in the Superseding Indictment.) During the carjacking of M.K. and R.T., M.K. and R.T., two young women, were sitting in M.K.'s vehicle getting ready to go out, when Akubu, Muse, and McCracken carjacked them. McCracken stayed in the offender vehicle, and Akubu and Muse got out. Akubu held a gun up to M.K. on the driver's side and demanded her car. Muse held a gun up to R.T. on the passenger side and also took R.T.'s purse, which had keys to her own car. Akubu and Muse drove away in M.K.'s car. Later, McCracken, Muse, and Akubu, went to the addresses on M.K. and R.T.'s identification cards, which were stolen during the carjacking. Akubu ultimately located R.T.'s second vehicle back near Island and Elmwood Avenues, and took that, as well. (Amadou Moussa bought these cars, and Moussa gave M.K.'s passport to his paramour so that she could illegally enter the United States.)

Three days before this carjacking, McCracken and Muse had the below conversation:

> **McCracken:** I was calling to ask you if y'all got y'all shit from the crib cuz they bout to search that jawn one of these days
>
> **Muse:** It's bullets in there
>
> **McCracken:** We gon grab that shit today
>
> **Muse:** Rd

## <u>North Carolina</u>

Muse was in North Carolina between December 19, 2021, and January 29, 2022, when he returned to Philadelphia. Muse had numerous conversations about the conspiracy with McCracken during this period, including the following:

**Muse** (12/23/21 via Instagram): What's the update on the apartment [earlier conversations show McCracken and Muse were trying to rent an apartment together]

**McCracken** (12/23/21 via Instagram): [Audio: I'm waiting on, uh, J-Rock. We gotta sell them yah-means and shit. My mom said twelve hundred more that's gonna be the first three months and shit so we should be able to move in. But that's all she waiting on.]

**Muse** (12/23/21 via Instagram): Rd

**Muse** (12/23/21 via Instagram): I need my bitch spicing me like this [three crying/laughing emojis followed by a video link to Akubu's Instagram of Akubu drinking what appear to be mixed drinks]

**Muse** (12/24/21 via Instagram): N****s gotta chill yo these dreams I had was crazy I had like 5 dreams I kept waking up every dream the cops was on our ass bro and ion have dreams for no reason

**McCracken** (12/24/21 via Instagram): [five crying/laughing emojis] yooooo

**Muse** (12/24/21 via Instagram): Bro rs [real shit]

**Muse** (12/24/21 via Instagram): I had multiple dreams last night

**Muse** (12/24/21 via Instagram): Beans [Antonion Walker-Garrett, an uncharged co-conspirator associated with 5807 Lindberg Boulevard, where McCracken and Muse would often stay] got booked

**McCracken** (12/24/21 via Instagram): [head smack emoji] , shit the way shit going they gon grab somebody. They tryna charge the 5 n****s that got caught for all the Johnny's

**Muse** (12/24/21 via Instagram): Wat 5 n****s

**McCracken** (12/24/21 via Instagram): That robbed the Congress woman

**Muse** (12/24/21 via Instagram): Oh rd

On January 12, 2022, McCracken messaged Muse photos of a gun (that appears to be the gun Fosque left on the seat of victim S.P.'s car—taken by McCracken, Abdul-Hakim, and Akubu during the carjacking of a couple eating ice cream on the Penns Landing bridge on January 16, 2022—when Fosque fled the Payless Car Rental burglary and was arrested), then McCracken

and Muse had the following conversation:

> **Muse** (1/12/22): Bitch u keeping it or what
>
> **McCracken** (1/12/22): Yeah ima bout to call you back
>
> **McCracken** (1/14/22): Should I keep the 21 or swap for the Glock30 gen5
>
> **Muse** (1/14/22): Keep
>
> **Muse** (1/14/22): Didn't u just say u was keeping it
>
> **McCracken** (1/14/22): Yeah , cuz just actually around so I'm tryna see wsp [what's up]
>
> **Muse** (1/14/22): It's a pound u don't want it to b short barrel especially if u putting switch [attachment that allows a handgun to fire as an automatic weapon] on it
>
> **McCracken** (1/14/22): But ima keep it

Muse continued to have conversations with McCracken while in North Carolina. On January 15, 2022, Muse messaged McCracken, "Grab them shells back from ya man today if u can[,]" and then sent McCracken a video of the back of someone firing an automatic weapon out of a car window (when Muse was arrested on March 1, 2022, police recovered his handgun with a Glock switch on the back, making the gun fire automatically).

While Muse was in North Carolina, McCracken, Abdul-Hakim, and Akubu carjacked M.C. and S.P., a couple eating ice cream on the Market Street bridge at Penns Landing on January 16, 2022. On January 19, 2022, McCracken paid Abdul-Hakim for his participation in the January 16 Market Street carjacking. The two had a conversation where Abdul-Hakim asked about when he would get the money, and McCracken told him to come to his cousin's house. At the same time as McCracken and Abdul-Hakim were texting, McCracken had the below simultaneous conversation with Muse:

**McCracken:** This mission shit only for me and you n***** doing too much with this shit

**McCracken:** Shit annoying

**Muse:** Rd and what happen who just burnt u out

**McCracken:** Leem dawg n****s really blowing my shit

**Muse:** He keep asking for the bread?

**Muse:** Or he don't like his cut

**McCracken:** Bro I just had to give this n**** my bread . He blowing my fucking phone up dawg

**McCracken:** Didn't even do shit

**McCracken:** Shit like that make me mad

**Muse:** Hm [how much] u give em

**Muse:** Bro u should've just made em wait for his bread

**McCracken:** Listen jrock [Akubu] just wanted to given em 500 cuz we only sold the range for 6 cuz it was fucked up. But me being me I said I would give him 500 too but the n**** hear that and do not stop calling. Like n**** burnt me out so much that I came outta my own pocket cuz I ain't want him to burn jrock out and keep calling him

**McCracken:** Then bro be on that how much I'm getting shit when we don't even know how much we getting for a wheel

**Muse:** Make sure u get his cut then

**Muse:** What he was supposed to get

**McCracken:** 500

Then, on January 22, 2022, the day after Dean Fosque was arrested for the Payless Car Rental burglary, where he fled from S.P.'s car (from the Penns Landing carjacking) and left a gun behind on the seat, McCracken and Muse had the following conversation:

**McCracken:** Well I got no pole nomore

> **Muse:** Wat happen
>
> **McCracken:** Dean booked and banged out a Johnny after he went on a mission wit the ybs [young bulls] we had a drop on. Just dumb shit
>
> **McCracken:** Cops found 2 guns
>
> **McCracken:** Shit killing me bro I'm losing everything fucking thing down this jawn & now I'm getting low on bread this shit a burn out [head smack emoji]
>
> **Muse:** Wtf!! They tryna crack down bro it's cool one more mission for us bro then put everything to the trap and chill off that shit , shit too hot right now just stay down till I come back ima get u my pop pole [gun] and we gon get back in the trap
>
> **Muse:** Im tryna slide on the 24th [Muse ultimately left North Carolina on January 29, 2022]
>
> **McCracken:** Bro it wasn't even the regular mission we be on they did sum Dumb shit , he tried to go wit ybs and take rentals off the lot

Muse returned from North Carolina on January 29, 2022, just as Akubu was coming back from North Carolina to distribute proceeds from the carjackings in Group K.

On January 31, 2022, the night before Group L, Abdul-Hakim messaged Muse, "HMU [hit me up] if y'all go out tonight."

## Group L

Overnight between February 1 and February 2, 2022, McCracken, Muse, Abdul-Hakim, and Akubu committed a spree of three carjackings. First, On February 1, 2022, at 10:20 p.m., the group carjacked a 2021 Toyota RAV4 from J.S. at 55 Hurley Court in Millbourne, which was right near the house where McCracken would often stay with his cousin. During this carjacking, McCracken stayed in the offender vehicle (the stolen Ford Escape also used during the Market Street carjacking on January 16, 2022) while Akubu, Muse, and Abdul-Hakim got out of the vehicle to commit the carjacking. J.S. had just parked his vehicle when Akubu, Muse, and

Abdul-Hakim approached him with firearms, took his keys, and stole his car. This vehicle was recovered the next day in Yeadon. [Counts 46 and 47.] *See* PSR ¶ 51.

Just over an hour later, on February 1, 2022, at 11:30 p.m., McCracken, Muse, Abdul-Hakim, and Akubu committed an armed carjacking of a 2020 Mercedes AMG from F.F. at 800 N. Delaware Avenue/1 Brown Street, an apartment complex in Philadelphia. During this carjacking, Akubu initially stayed in the Ford Escape, while Abdul-Hakim, followed shortly thereafter by McCracken and Muse, got out and approached F.F. with guns in the apartment building's parking lot. The defendants forced the victim to the ground and threatened to shoot him. The three had trouble driving the Mercedes, so they got Akubu from the Ford Escape. Akubu got into the Mercedes and drove it away, while McCracken, Muse, and Abdul-Hakim got back into the Ford Escape and left in that vehicle. The Mercedes was recovered the next day in Philadelphia. [Counts 48 and 49.] *See* PSR ¶ 52.

McCracken, Muse, Abdul-Hakim, and Akubu committed the third carjacking in that spree on February 2, 2022, at 3:57 a.m., when they carjacked a 2018 Toyota Highlander with a bike rack from M.A. at 2810 S. 73rd Street in Philadelphia, using Akubu's Camry this time. Akubu stayed in his Camry, and he let out McCracken, Muse, and Abdul-Hakim to commit the carjacking. After parking his car in his driveway, M.A. was walking into his home when McCracken and Abdul-Hakim ran up his steps, held guns to his head, and demanded his keys. They threw his keys to Muse, who was waiting, gun in hand, at the front of the walkway to the home. The three got into M.A.'s vehicle and drove off. This vehicle was recovered in a shipping container in Charleston, South Carolina, destined for Africa. [Counts 50 and 51.] *See* PSR ¶ 53.

## Group M

Overnight from February 3 into February 4, 2022, McCracken, Muse, Akubu, and Lee committed a spree of two carjackings. First, on February 3, 2022, at 11:15 p.m., McCracken, Muse, Akubu, and Lee committed an armed carjacking of a 2019 Toyota RAV4 from K.Y. at 3900 M Street in Philadelphia across from the Erie Lanes bowling alley. K.Y., a rideshare driver, was picking up pizza for an Uber Eats delivery when he was carjacked. During this carjacking, Lee stayed in the car, while McCracken, Muse, and Akubu got out to commit the carjacking. They approached the victim with guns and demanded his car. The defendants pushed the victim to the ground while saying that they would shoot him, and they took his car. [Counts 52 and 53.] *See* PSR ¶ 54.

About an hour later, on February 4, 2022, at 12:12 a.m., McCracken, Muse, Akubu, and Lee carjacked a 2019 Toyota RAV4 from A.T. at 7605 Elmwood Avenue in Philadelphia. The crew followed A.T. until she parked in her driveway. Lee stayed in Akubu's Camry, while McCracken, Muse, and Akubu got out to commit the carjacking. A.T. parked her car in her driveway and was walking up the stairs to the door of her home when Akubu, armed with a firearm, grabbed her bag. A.T. began screaming, and her husband began to open the door from inside the home. McCracken, situated at the bottom of the steps, fired his weapon (the same .40 caliber handgun Coleman used during the second shooting of M.D. on January 27, 2022), striking the front door. The men drove off in A.T.'s car. This vehicle was sold to Amadou Moussa, and Davon Squire helped him to transport the car from Pennsylvania to Delaware where it could be loaded onto a shipping container and taken to the Port of Maryland. A.T.'s vehicle was later recovered in a shipping container in Norfolk bound for Niger (in a container along with

the carjacked car from A.K., who would be carjacked and shot in the hand and foot on February 10, 2022). [Counts 54 and 55.] *See* PSR ¶ 55.

In the evening after this carjacking, Muse and McCracken had the following conversation about getting gloves to go out and do more carjackings:

> **McCracken:** Wya [where you at]
>
> **Muse:** In front of the crib
>
> **Muse:** Wya
>
> **McCracken:** Fuck is you doing in front of the crib
>
> **Muse:** wit jrock [Akubu]
>
> **Muse:** Waiting for u
>
> **McCracken:** Oord
>
> **Muse:** In the wheel
>
> **Muse:** Wya
>
> **McCracken:** Passing tri star get my gloves out t wheel
>
> **McCracken:** Ya wheel
>
> **Muse:** We gonna go to the wheel b4 we leave
>
> [Additional messages about McCracken's bookbag omitted]
>
> **Muse:** Come to the back
>
> **McCracken:** Rd don't forget my gloves
>
> **McCracken:** Y'all called Maj [Lee]?
>
> **Muse:** Dh [dickhead] I'm waiting for u to come to the back
>
> **Muse:** I gotta get some out the wheel too u won't b alone stop bitchin
>
> **McCracken:** They in the passenger side door , bitch I'm tryna do this so we can just be out

**Muse:** Mine in the driver side door

**Muse:** And we not gon just b out cuz I still have to get mine

**McCracken:** You weird [3 crying/laughing emojis]

Muse: You lazy

**<u>Group A</u>**

On February 6, 2022, McCracken, Muse, Abdul-Hakim, and Akubu attempted to carjack B.C. at 7501 Elmwood Avenue, in the U-shaped block near prior carjacking locations, and then carjacked and murdered G.B. outside 2118 Afton Street. The crew began arranging to meet before 5 p.m. that evening, and ultimately, they all got into Akubu's Camry to drive around search for victims.

Around 6:39 p.m., McCracken, Muse, Abdul-Hakim, and Akubu attempted to carjack a 2018 Toyota Highlander from B.C. at 7501 Elmwood Avenue in Philadelphia. Akubu dropped off McCracken, Muse, and Abdul-Hakim near the U-shaped block to commit the carjacking. As the victim exited his car at 6:39 p.m., he was pushed down and pistol-whipped in the face, causing a significant and lasting eye injury. However, the victim's key fob was broken, so the three were unable to take B.C.'s vehicle. Muse sent pin drops to Akubu so that Akubu could pick the group up and continue hunting. [Count 56.] *See* PSR ¶ 56.

The group drove around Philadelphia for about another hour or so looking for their next victim. Just after 8 p.m. on February 6, 2022, the group saw G.B. driving his Toyota RAV4 in Northeast Philadelphia, sealing his fate.

G.B. was a former marine and an elected committeeman in the district in which he was murdered. He had most recently worked for FedEx and retired after an on-the-job injury that caused him to be disabled. He was a husband, father of four, grandfather, son, sibling, and

beloved member of his community. Earlier in the day of his murder, G.B. was doing what he did often—helping one of his sons care for his then-16-month-old grandchild. G.B. left during the evening, and then, just before he was attacked, he had driven to his elderly mother's home on the 2100 block of Afton Street to bring her supplies.

G.B. parked in the alleyway behind his mother's home—unaware that the carjackers had followed him. Akubu parked near the top of the block and dropped off McCracken, Muse, and Abdul-Hakim to ambush G.B. All the defendants were armed with guns, and McCracken had the FN handgun. The three defendants attacked G.B. to take his RAV4.

Video surveillance captured McCracken, Abdul-Hakim, and Muse walking down the alley behind Afton Street, and then audio captured McCracken firing his FN handgun three times. Audio captured the sounds of tires screeching and a horn honking, then seconds later, audio captured G.B. screaming. Almost as soon as G.B. started screaming, McCracken fired one shot. G.B. continued screaming after the first shot. About 8 seconds later, McCracken fired two more shots in quick succession at G.B. as he continued to scream. Then, the three men zoomed off in G.B.'s RAV4 as he lay dying in mother's driveway.

Neighbors called 911, and police arrived on scene. Officers noticed that G.B. was still alive, but barely, and attempted to offer comfort. The ambulance arrived shortly thereafter, and G.B. was rushed to the hospital. G.B. succumbed to his wounds just after 9 p.m. on February 6, 2022. G.B. suffered two gunshot wounds, the first entered on his right back and the second entered on his right hip. Both bullets were still in his body when he died.

McCracken, Muse, and Abdul-Hakim met back up with Akubu in an alley in Darby near where McCracken's relative lived, and then they all went to the Parkview Court Apartments.

They realized that in their haste fleeing the scene had forgotten to get G.B.'s key fob. [Counts 2, 3, and 61.] *See* PSR ¶ 57.

Akubu and the car buyer, Moussa, enlisted the help of A.G. to help make a new key for G.B.'s car, but A.G. was not able to do that for about a week. Moussa took G.B.'s microwave from the back of the RAV4 and put it in his home (where it was ultimately recovered during an FBI search warrant in April of 2023). In the meantime, G.B.'s RAV4 remained at the Parkview Court Apartments.

About an hour after G.B.'s carjacking and shooting, McCracken took a screenshot of the Citizen App showing the ambulance at the murder scene on Afton Street. McCracken also confessed to the shooting via text message, telling one contact at 9:07 p.m. that night, "My fault bro sum shit happened I just tagged sum gang wallahi [I swear to God] , ima see if I can get a Lyft to you[.]" When the contact asked what happened, McCracken responded, "Had just tagged sum up north bro shit got hot [head smack emoji]."

McCracken then proceeded to conduct several google searches around 11 p.m. that evening, including, "if u kill somebody[,]" "if u kill someone[,]" and "I killed someone in real life." He also visited several websites based on these searches, including one called "What does it feel like to murder someone? – Quora." On February 7, 2022, at 8:14 a.m., McCracken messaged Muse, "Make sure n****s ain't m got noting from old head , he died so yk [you know] that gone be oss [on some shit.]"

Later after the murder, around 10:15 p.m., police conducted a traffic stop of Muse and Abdul-Hakim in Muse's car because Muse was driving erratically. During the stop, Muse intentionally impeded the young officer, refusing the step out of the car and filming him. Muse posted those videos to his Instagram story, with different captions, including several

crying/laughing face emojis, a caption with three crying/laughing emojis followed by "they try get us[,]" and another caption, "Mr .Rookie[.]" Around 11:45 p.m. that night, Muse had an Instagram chat with a contact about the stop, saying:

> **Contact:** What happened next
>
> **Muse:** N**** they let us go
>
> **Muse:** Still got 3 poles [guns] in here
>
> **Contact:** He a rookie
>
> **Muse:** Switch 22 and fn
>
> **Contact:** So that shit work every time?
>
> **Muse:** I got stash so
>
> **Contact:** reacted [heart emoji] to your message
>
> **Contact:** All poles fit in there?
>
> **Muse:** Yeah more can

On February 7 and 8, 2022, Muse sent Akubu several photos of firearms.

## Group N

Undeterred by the escalation of their violence from non-fatal woundings to murder, the defendants continued committing carjackings after the murder of G.B. On February 10, 2022, at 11:32 p.m., McCracken, Muse, and Akubu committed an armed carjacking of a 2021 Toyota RAV4 from A.K. at 7400 Torresdale Avenue in Philadelphia. Akubu was out that night with McCracken and Muse, and they spotted A.K., a rideshare driver, driving in the area, and they followed him. Akubu parked up the block and let out McCracken and Muse to commit the carjacking. A.K. had pulled over and was waiting for his next fare when McCracken and Muse opened his car doors, threatened to shoot him, and made him get on the ground. After his keys

were stolen, A.K. got up and starting running away. As A.K. was running away and tripping due to his fear, one of the defendants fired at A.K. multiple times, striking A.K. in the hand and foot. McCracken and Muse drove off in A.K.'s car. [Counts 57 and 58.] *See* PSR ¶ 59.

This car was also sold to Amadou Moussa, and by this time, McCracken was beginning to become more involved in the sale of the vehicles, and Muse also wanted to be more involved in that aspect of the crimes. In fact, a few hours after this carjacking, McCracken responded to a call from Muse, and the two had the following conversation:

> **McCracken:** We with the buyers you good ?
>
> **Muse:** Yea making sure everything good wit y'all
>
> **Muse:** Omw [on my way]
>
> **McCracken:** Rd [alright]
>
> **McCracken:** Ima meet you on the 8 [5807 Lindbergh]
>
> **McCracken:** [10 second phone call]
>
> **Muse:** [24 second phone call]
>
> McCracken: Got woods [backwoods cigarettes] I'm in a Lyft so I can't grab non
>
> **Muse:** Call me rq
>
> **McCracken:** Hold on
>
> **McCracken:** [58 second phone call]
>
> **Muse:** [28 second phone call]
>
> **Muse:** [6 second phone call]
>
> **McCracken:** U need to just listen
>
> **McCracken:** Bro [Akubu] bring me relax [crying/laughing emoji]
>
> **McCracken:** Unlock door

Muse was clearly trying to come and be part of the meeting with the buyers. Around the same time, McCracken messaged Coleman, "Meeting this buyer rn [right now]." This vehicle was recovered in a shipping container in Norfolk destined for Niger (along with A.T.'s RAV4 that was taken after she was shot at on her steps on February 4, 2022, in Group M).

The next night, McCracken, Muse, and Akubu went out again. On February 11, 2022, at 11:45 p.m., McCracken, Akubu, and Muse carjacked a 2018 Land Rover from J.S. at the Cirro Apartments at 625 S. Goddard Boulevard in King of Prussia. J.S. had been a target of this group for several weeks after Akubu had seen her Range Rover and put a tracker on it. They referred to J.S. in various messages as "the bitch with the range."

In fact, the group had gone up to the Cirro Apartments to stalk J.S. on various previous occasions, including the night of the four carjackings from January 27-28, 2022, in Group K. Additionally, just a few hours before the carjacking and murder of G.B., on February 6, 2022, McCracken texted Lee, "Wya [where you at] ? Jrock [Akubu] need us" and "the bitch with the range moving."

McCracken, Muse, and Akubu finally completed their mission on February 11, 2022. McCracken, Muse, and Akubu had followed J.S.'s vehicle back to her apartment complex. J.S. was returning from a haircut appointment with her seven-year-old daughter, and she parked in the garage of her apartment building in King of Prussia. Muse stayed in Akubu's Camry, and McCracken and Akubu got out to execute the carjacking. J.S. was attempting to get her seven-year-old daughter out of the vehicle when Akubu and McCracken put guns against her head. J.S. got her daughter out of the car, and Akubu handcuffed her to another car. Akubu demanded the passcode to her phone, but she said she did not remember. In response, Akubu told McCracken, "Bro, shoot this bitch. She think I'm playing." J.S. then gave them her passcode. The defendants

drove off in her car. The next morning, on February 12, 2022, around 9 a.m., McCracken messaged Coleman, "Wish you came out last night we grabbed the range[.]" Moussa also purchased this car, and it was recovered in a shipping container in Savannah, Georgia, destined for Niger. [Counts 59 and 60.] *See* PSR ¶ 60.

After this carjacking, Muse messaged McCracken in the early hours of the morning, "Call me and say the buyers coming now" and "hurray up." Shortly after, Muse's girlfriend messaged him and the two had the below conversation:

> **Muse's girlfriend:** Wyd [what you doing]
>
> **Muse:** Chilling Ima call u when I get in the car
>
> **Muse:** Why can't I come over
>
> **Muse's girlfriend:** Doing what ?
>
> **Muse:** Waiting for this money
>
> **Muse's girlfriend:** where
>
> **Muse's girlfriend:** why can't you share your location with me
>
> **Muse:** Gonna keep going on and off I turn my location off when I'm Doing stuff I have no business

**<u>Group B</u>**

On February 11, 2022, just before McCracken, Muse, and Akubu carjacked J.S. in King of Prussia, victim A.G. was finally available to make the key for G.B.'s carjacked RAV4. A.G. was a 28-year-old man from Sierra Leone, who was a key maker or locksmith, and he was a mechanic. He was a beloved husband, father, son, and sibling. In fact, his wife and son had recently come to join him in America.

Earlier that morning, around 9 a.m., McCracken messaged Abdul-Hakim, "Naw the jawn me u and miyn [Muse] took still there just need a key so we tryna get that done today I know

n****s want they bread [.]" A.G. went to the Parkview Court Apartments, meeting with Moussa, and made the key between 4 p.m. and 8 p.m. that day. G.B.'s Toyota GPS data showed that the vehicle turned on again on February 11, 2022, at 8:02 p.m. At that time, A.G. also texted Akubu, "I just finished the rav4…I ask for $1200..[.]"

Moussa called his runner, Davon Squire, who came and picked up G.B.'s RAV4 from Parkview Court Apartments, and drove it to an alley at 63rd and Glenmore (leaving his fingerprint behind).

Because the vehicle was generating GPS again after A.G. made the key and the vehicle was turned on, Toyota was able to give law enforcement its most recent location at 63rd and Glenmore. Based on that data, on February 12, 2022, a police sergeant located G.B.'s car in the alley after 7 a.m. Squire photographed the sergeant waiting with G.B.'s car and messaged that photo to Moussa. Moussa, Squire, and Akubu then had various communications that morning about G.B.'s car being located by police. While Akubu was trying to call Squire, he was keeping McCracken informed, and McCracken was keeping Muse informed.

Akubu then met with Moussa and Squire at 68th and Greenway, where Akubu asked if Squire and A.G. had criminal records, concerned that if they did, their fingerprints would be in law enforcement databases. He worried that if they left fingerprints behind, police would identify them, and they would become witnesses against the conspirators. Moussa and Squire said Squire did not have a record (he did) but they did not know if A.G. did. As soon as Akubu left that meeting, he called McCracken to tell him what he learned.

Akubu went directly to the house at 5807 Lindbergh to meet with McCracken and Muse to discuss the problem of A.G. potentially having left forensics behind and becoming a witness against them. The group feared that if A.G. became a witness against even one of them, the entire

conspiracy would soon be identified by law enforcement. Akubu, McCracken, and Muse all agreed that they would need to kill A.G. to prevent him from potentially becoming a witness against the conspiracy. Akubu decided that he would pull the trigger because he had to "get his hands dirty," as he was not physically present with McCracken and Muse when McCracken shot and killed G.B. Thus, if Akubu physically committed this murder, he would have as much to lose as McCracken and Muse.

Akubu left and ultimately returned a few hours later to pick up the FN handgun that McCracken and Muse had been keeping at 5807 Lindbergh to use in the murder. Akubu then met back up with McCracken and Muse at 58th and Haverford in order to get the keys to the stolen Ford Escape (Fatleem's Johnny) to use in the murder. McCracken and Muse gave him keys, and Akubu drove straight to where the crew kept the Ford Escape. Akubu left his Camry and got into the Ford Escape. He drove straight to the Larchwood Apartment Complex at 8100 Grovers Avenue, where he had arranged to meet with A.G. under the guise of making another key.

Then, while in the Larchwood Apartments waiting for their victim, Akubu called McCracken, and Muse was also on speakerphone. They all again agreed that the murder had to be committed, and Muse told Akubu to turn off his phone location (so he could not be tracked by law enforcement). While still in the apartment complex, Akubu again called McCracken trying to back out of committing the murder, to which McCracken replied that if he needed them (referring to McCracken and Muse), they were around, indicating to Akubu that the murder had to be committed.

Akubu saw A.G.'s van drive by and miss the entrance into the Larchwood Apartments parking lot, so he called A.G. to direct him where to go. A.G. arrived in his van in the parking lot of the Larchwood Apartments around 7:14 p.m. Akubu talked to him by the van, at first stalling,

asking him if he had a criminal record and apologizing. Akubu then started shooting. A.G. ran from the van while Akubu shot at him multiple times. Akubu then tried to get into the Ford Escape but could not get it to start. Akubu then tried to steal A.G.'s van. As he was getting into the van, A.G. grabbed onto his leg, and Akubu shot him two more times. Akubu got into the victim's van and drove back to 7901 Mars Place, where he lit the van on fire, burning his arms in the process. Akubu then got back into his Camry and drove away. When police arrived within minutes, A.G. was no longer living. [Counts 4, 5, 6, and 62.] *See* PSR ¶ 58.

During this murder, McCracken and Muse were together in a nearby apartment complex at 2600 Caesar Place. That location was across from the Larchwood Apartments and within hearing range of sirens. After the murder, but before Akubu had any communications with either Muse or McCracken, Muse sent messages to McCracken about Akubu, who just murdered A.G. Muse told McCracken to stop talking about Akubu to others because they did not know who Akubu knew. Muse and McCracken continued to worry about people outside the conspiracy having too much information about a murder they planned that was just committed. After the murder, McCracken and Muse went back to stay at McCracken's cousin's house, and they had more communication with Akubu. Akubu spoke with McCracken later after the murder to tell him he took care of the key maker, and McCracken said he knew and had heard about it and said "Yous on some John Wick shit."

That night, McCracken and Muse went to stay at McCracken's cousin's house, and McCracken texted his cousin "…my mom will tell you Miyn [Muse] loyal lol. That's who I'm always wit he the n**** that stayed last time. . . ."

On February 15, 2022, and into the morning of February 16, 2022, McCracken and Muse had the following conversation:

**McCracken:** I might chill till the backend come I lost 500$ gambling

**Muse:** Yb [young bull] u gon be in the wheel

**Muse:** But rd hit me [call me] when u popping out

**McCracken:** Gotchu bitch , I'm boutta blow JR jack up this range [J.S.'s Range Rover] gotta go I got another jawn lined up

**Muse:** How many n****s

**Muse:** I got one too

**McCracken:** It's gillie ["Gil," a frequent contact of McCracken] lick [robbery] fr [for real] so it would just be me u JR and gil

**McCracken:** All these buyers gotta do is say the word we can get shit done

**Muse:** The buyers still on bs?

**McCracken:** I guess so [2 head smack emojis] shit been like 4 days

**Muse:** Man they op [2 crying/laughing emojis and a broken heart emoji]

**McCracken:** That shit just sitting bro , I'm feeling like we just be taking these jawns for nun , we barley getting these jawns sold , I'm ready to rob all the buyers and say fuck it

**Muse:** Man Idec [I don't even care] no more either that range [J.S.'s Range Rover] gotta move tho

**Muse:** No way they just keep letting it sit there in that lot

**McCracken:** I know but they just need to buy it cuz once he turn that shit on the law gon ping his lo [location], he was saying he ain't tryna risk the law finding it by turning it on

**McCracken:** Shit just be too much [head smack emoji]

**McCracken:** Every time he call I be thinking he calling for that reason , I really want these jawns sold so we can go back out

**Muse:** Should I see if n****s wanna come together wit this bum shit or just keep doing me

**Muse:** Cuz wit the #s and the traps between us we can fuck the city up [2

laughing/crying emojis]

**McCracken:** Just us , n****s gon get to big headed

On February 17, 2022, Akubu messaged photos of the FN and a Draco firearms to Muse. Muse then posted the firearms to his Instagram story, and Muse messaged people about trying to buy the firearms, including a message Muse sent saying, "U still looking for 5.7?" (that is the caliber of the FN used in both murders). That same night, despite the fact that two people were now dead, Muse messaged McCracken, "I gotta rap wit u and jrock I think I got sum for us[.]"

**Consciousness of Guilt**

Akubu was arrested on February 18, 2022. McCracken and Muse continued to call and message him with no response. On February 19, 2022, McCracken messaged Muse "Man wsp wit jrock I'm thinking sum happened now , and he got the whistle smh[.]" A whistle is a gun, and Akubu was indeed arrested with the FN used to murder G.B. and A.G.

In the days after Akubu was arrested, both McCracken and Muse tried to call Akubu several times. On February 20, 2022, McCracken messaged Muse Akubu's address. On February 22, 2022, McCracken messaged Muse a link to the press conference about Akubu's arrest.

When Akubu was arrested on February 18, 2022, police recovered the FN used in both murders and other carjackings, Akubu's cell phones, and numerous identifications from multitudes of carjacking victims. On February 22, 2022, McCracken had the below conversation with Coleman:

**McCracken:** I'm wit n[****s]

**McCracken:** But that's me and bro situation

**McCracken:** N[****] they got everything

**McCracken:** The gun we used

**McCracken:** His jack [cell phone]

**Coleman:** Dh [dickhead]

**McCracken:** Everybody we robbed IDS

**McCracken:** Delete what you sent me on the gram

On February 23, 2022, McCracken responded to a question from a contact, "Why you ain't turn ya jack [cell phone] on" by saying "I can't bro shit hot" and "They booked em for all our shit he took the fall for everything[.]" At the end of February, both McCracken and Muse changed their cell phone numbers.

When Muse was arrested on March 1, 2022, in his girlfriend's house, police recovered Muse's gun, a Glock .40 caliber handgun, model 27 (serial number BCYH964), from underneath his girlfriend's bed. Muse had several photographs of this gun on his phone. This gun was equipped with a Glock switch, that allows a firearm to fire as an automatic weapon.

## III. SENTENCING CALCULATION

### A. Statutory Maximum and Mandatory Minimum Sentences

The PSR accurately lists the statutory maximum and mandatory minimum at sentences as follows:

Count 1: The maximum term of imprisonment is five years. 18 U.S.C. § 371.

Count 2: The term of imprisonment is any number of years up to life or death.[2] 18 U.S.C. § 2119(3).

Counts 3 and 6: The term of imprisonment is any number of years up to life or death per count. 18 U.S.C. § 924(j)(1).

Count 4: The term of imprisonment is mandatory life or death. 18 U.S.C. §§ 1512(k) and 1111.

[2] There is no death penalty involved in this case.

Count 5: The term of imprisonment is mandatory life or death. 18 U.S.C. §§ 1512(a)(3)(A) and 1111.

Counts 46, 48, 50, 52, 54, 56, and 59: The maximum term of imprisonment is 15 years'. 18 U.S.C. §§ 2119(1) and 2.

Counts 47, 49, 51, 53, and 60: The minimum term of imprisonment is 7 years consecutive, and the maximum term is life per count. 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2.

Counts 55, and 58: The minimum term of imprisonment is 10 years consecutive, and the maximum term is life per count. 18 U.S.C. §§ 924(c)(1)(A)(iii) and 2.

Count 57: The maximum term of imprisonment is 25 years. 18 U.S.C. § 2119(2).

PSR¶ 251.

The total statutory maximum sentence is thus life in prison, with a mandatory minimum of life imprisonment plus 660 months imprisonment, 5 five years' supervised release, a $5,250,000 fine, and a $2100 special assessment. PSR¶ 251, 253, 258, 259.

**B. Sentencing Guidelines Calculation**

The government agrees with the calculations presented in the PSR; that is, that the defendant is assigned to criminal history category I, offense level 43; that in addition Counts 47, 49, 51, 53, and 60 require 84-month terms of imprisonment per count and Counts 55 and 58 require 120-month terms of imprisonment per count, which shall be imposed consecutively to any other term of imprisonment, pursuant to 18 U.S.C. § 924(c)(1)(D)(ii); and thus that the effective guideline imprisonment range is life plus 660 months. PSR¶ 251. The government recommends a sentence within that range.

**C. Muse's Objection to the Mandatory Life Sentences on Counts 4 And 5**

McCracken and Muse disagree with the PSR's discussion of the mandatory life sentences attached to Counts 4 and 5. They argue that those Counts instead carry sentences of a term of years or life. Their argument is unavailing.

Count 4 charges McCracken and Muse with conspiring to tamper with a witness by murder in violation of 18 U.S.C.§ 1512(k). Count 5 accuses them of carrying out and aiding and abetting that murder, in violation of 18 U.S.C. § 1512(a)(1)(C), (a)(3)(A) and 2.

18 U.S.C. § 1512(a)(1)(C) provides in pertinent part that "(w)hoever kills or attempts to kill another person, with intent to…prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings…shall be punished as provided in paragraph (3)…."

18 U.S.C. § 1512 (a)(3)(A) provides in pertinent part that "The punishment for an offense under this subsection is…in the case of a killing, the punishment provided in sections 1111 and 1112…"

18 U.S.C. § 1512(k) provides in pertinent part that "Whoever conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

18 U.S.C.§ 1111 provides in pertinent part that "Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing… is murder in the first degree…. Any other murder is murder in the second degree[;]" and "Within the special maritime and territorial jurisdiction of the United States, Whoever is guilty of murder in the first degree shall be punished by death or by imprisonment for life; Whoever is guilty of murder in the second degree, shall be imprisoned for any term of years or for life."

In sum, McCracken and Muse are subject to mandatory life sentences on Counts 4 and 5 if they conspired to commit and committed and aided and abetted first degree murder in the

death of A.G., and were convicted of doing so. They argue that there is insufficient proof that they were convicted of committing a first-degree murder, and that there should have been a jury interrogatory asking that question. Absent such an interrogatory, they argue that they should be sentenced as if the murder was a second-degree murder, rather than a first-degree murder. This argument lacks merit; the charges for which they were convicted in Counts 4 and 5 specifically charged them in the language of 18 U.S.C. § 1111 with first degree murder in the killing of A.G. The jury convicted them on both Counts. The jury could not have done so absent a finding that the killing was planned and premeditated.

Count 4 of the Superseding Indictment charged McCracken and Muse with conspiring to "murder, and willfully cause the murder of, A.G., a person known to the Grand Jury, as defined in Title 18, United States Code, Section 1111, that is, an unlawful, willful, deliberate, malicious, and premeditated killing with malice aforethought, to prevent communication by A.G. to a law enforcement officer or judge of the United States of information relating to the commission of federal offenses…." Count 4 went on to charge the specific steps taken by the defendants to plan and execute the murder, that is, that they "discussed and planned" the murder; that on the day of the murder they "used a ruse" to lure the victim to a meeting; and that they provided the shooter with keys to "a vehicle for use in the killing" of the victim. The Court correctly instructed the jury as to the elements of conspiracy, in pertinent part as follows:

> "A conspiracy is a kind of criminal partnership. In order for you to find defendants guilty of conspiracy to commit offenses against the United States, you must find that the Government proved beyond a reasonable doubt each of the following four elements.
>
> First, that two or more persons agreed to commit an offense against the United States as charged in the indictment and defined by me. Second, that the defendants were a party to or a member of that agreement. Third, that the defendants joined the agreement or conspiracy knowing of its objectives to commit offenses against

> the United States and intending to join together with at least one other alleged conspirator to achieve those objectives, that is, that a defendant and at least one other alleged conspirator shared a unity of purpose and the intent to achieve a common goal or objective to commit an offense against the United States. And fourth, that at some time during the existence of that agreement or conspiracy at least one of its members performed an overt act in order to further the objectives of the agreement. I will explain each of these elements in more detail.
>
> [T]he first element of the crime of conspiracy is the existence of an agreement. The Government must prove beyond a reasonable doubt that two or more persons knowingly and intentionally arrived at a mutual understanding or agreement either spoken or unspoken to work together to achieve the overall objective of the conspiracy…
>
> …What the Government must prove beyond a reasonable doubt is that two or more persons in some way or manner arrived at some type of agreement, mutual understanding or meeting of the minds to try to accomplish a common and unlawful objective.
>
> … If you find that a criminal agreement or conspiracy existed then in order to find the defendants guilty of conspiracy you must also find that the Government proved beyond a reasonable doubt that the defendants knowingly and intentionally joined that agreement or conspiracy during its existence.
>
> …The Government must prove that the defendants knew the goals or objectives of the agreement or conspiracy and voluntarily joined it during its existence intending to achieve common goals or objectives and to work together with the other alleged conspirators towards these goals or objectives…
>
> … in order to find the defendant's guilty of conspiracy, you must find that the Government proved beyond a reasonable doubt that the defendants joined the conspiracy knowing of its objectives and intending to help further or achieve those objectives. That is the Government move prove that: one, the defendants knew of the objectives or goals of the conspiracy. Two, that the defendants joined the conspiracy intending to help further or achieve those goals or objectives. And three, that the defendants and at least one other alleged conspirator shared a unity of purpose towards those objectives or goals.

DI 537 at 30-33.

The Court applied its general instruction on conspiracy to the conspiracy charged in Count 4, and described the crime of tampering with a witness by murder:

> "I have defined the crime of conspiracy already and that definition applies here as well to conspiracy to tamper with a witness by murder. So next, I will explain the crime of tampering with a witness by murder.
>
> Some of the defendants are charged with killing a [A.G.] with the intent to prevent a communication about the commission or possible commission of a federal offense to a federal law enforcement officer. Federal law prohibits killing a person in order to prevent a communication about the commission or possible commission of a federal offense to a federal law enforcement officer. For you to define the defendants guilty of this crime, you must be convinced that the Government has proven each of the following things beyond a reasonable doubt.
>
> First, that the defendants killed [A.G.]. And second, that the defendants killed [A.G.] with the intent to prevent the communication by any person to a federal law enforcement officer relating to the commission or possible commission of a federal crime.

DI 537 at 48.

In sum, the Court's instructions made it clear that, in order to convict McCracken and Muse of conspiring to murder A.G. to prevent his cooperation with law enforcement, the jury would have to find that the defendants knowingly intended and agreed in advance to carry out that murder, and that at least one of them carried out an overt act to advance that shared goal.

Count 5 of the Superseding Indictment charged McCracken and Muse with A.G.'s murder, that is, that they "murdered, and willfully caused the murder, and aided and abetted the murder, of A.G., a person known to the Grand Jury, as defined in Title 18, United States Code, Section 1111, that is, an unlawful, willful, deliberate, malicious, and premeditated killing with malice aforethought, to prevent communication by A.G. to a law enforcement officer or judge of the United States of information relating to the commission of federal offenses…

The Court provided a definition of aiding and abetting in its instructions, in pertinent part as follows:

> A person may be guilty of an offense because he personally committed the offense himself or because he aided and abetted another person in committing the offense. A person who has aided and abetted another person in committing an offense is often called an accomplice. The person who the accomplice aids and abets is known as the principal. …
>
> In order to find the defendants guilty of … tampering with a witness by murder … because he aided and abetted these principals in committing these offenses, you must find that the Government proved beyond a reasonable doubt each of the following four requirements.
>
> First, that the relevant principal committed the offenses charged by committing each of the elements of the offenses charged as I have explained those elements to you in the instructions. The principal need not have been charged with or found guilty of the offenses, however, as long as you find the Government proved beyond a reasonable doubt that he committed the offenses.
>
> Second, that the defendant knew that the offenses charged were going to be committed or were being committed by the relevant principal.
>
> And third, that the defendant knowingly did some act for the purpose of aiding, assisting, soliciting, facilitating, or encouraging the relevant principal in committing the specific offenses charged and with the intent that the relevant principal commit those specific offenses.
>
> And fourth, that the defendant performed an act in furtherance of the offenses charged.
>
> In deciding whether a defendant had the required knowledge and intent to satisfy the third requirement for aiding and abetting, you may consider both direct and circumstantial evidence, including a defendant's words and actions and the other facts and circumstances. However, evidence that a defendant merely associated with persons involved in a criminal venture or was merely present or was merely a knowing spectator during the commission of the offenses is not enough for you to find a defendant guilty as an aider and abettor. If the evidence shows that

> a defendant knew that the offense was being committed or was about to be committed, but does not also prove beyond a reasonable doubt that it was a defendant's intent and purpose to aid, assist, encourage, facilitate, or otherwise associate himself with the offense, you may not find a defendant guilty of the offenses as an aider and abettor.

DI 537 at 43-44.

The Court's instructions thus made it clear that in order to convict McCracken and Muse as aiders and abettors in the murder of A.G. as charged in Count 5, the jury had to find that they intended for that murder to be committed, and that they took some action to facilitate it.

The Court also provided a definition of murder in its instructions concerning Count 6, which charged a violation of 18 U.S.C.§ 924(j) in connection with the murder of A.G. (and which described that murder as premeditated consistent with the definition of first-degree murder) as follows:

> Title 18 of the United States Code, Section 10 924(j), makes it a separate crime to cause the death of another person in the course of the use of a firearm during and in relation to a crime of violence, or in the course of the possession of a firearm in furtherance of a crime of violence. As I have just instructed you… Count 5 of the superseding indictment charges, some of the defendants with tampering with a witness by murder which caused the death of another person. These are violations of federal law.
>
> For you to find the defendants named in Counts 2 and 5 guilty of causing the death of another person in the course of using and carrying a firearm during and in relation to a crime of violence, the Government must prove each of the following beyond a reasonable doubt.
>
> First, that the defendants committed the crime of … tampering with a witness by murder as charged in Count 5 of the superseding indictment.
>
> Second, that the defendants used or carried a firearm during and in relation to the crime of … tampering with a witness by murder, a crime of violence which may be prosecuted in federal court…

> Third, that the defendants caused the death of a person through the use of a firearm. And fourth, the killing of that person was a murder…
>
> As to the fourth element, I will next define the meaning of murder. Number 45, murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, premeditated killing is murder in the first degree. Any other murder is murder in the second degree.
>
> The term malice aforethought means either to kill another person deliberately and intentionally or to act with callous and wanton disregard for human life. The word premeditation means with planning or deliberation. The passage of time is a factor which you may consider in attempting to determine if a defendant acted with premeditation. The amount of time needed for premeditation of a killing can depend on the person and the circumstances. The time must be long enough after forming the intent to kill, however, for the killer to have been fully conscious of the intent and to have considered the killing.

DI 537 at 45-48.

The jury convicted both McCracken and Muse on Counts 4 and 5, as well as Count 6. Thus, in Count 4, they convicted both men of conspiring and agreeing in advance to murder A.G., planning the murder of A.G. in advance, providing a vehicle for use in murdering A.G. in advance, and using a ruse to lure A.G. to his death. The acts undergirding the jury's verdict fit squarely within the definition of first-degree murder described in the Court's instructions: a willful, deliberate, malicious, premeditated killing. They clearly do not fit within the definition of a second-degree murder, that is, a murder that is not a willful, deliberate, malicious, premeditated killing. It is logically impossible for McCracken and Muse to have conspired, agreed upon, and planned in advance to commit a second-degree murder, since by definition a second degree murder–a murder that is not deliberate and not premeditated–cannot be conspired nor agreed upon and planned in advance. That same logic also applies to the jury's verdict on

Count 5.

McCracken's and Muse's citation to *United States v. Perrin* 149 F.4th 267 (3d Cir. 2025) is unavailing. In *Perrin*, the lone defendant was charged with killing a witness to prevent her from cooperating with law enforcement. The indictment did not allege that the killing was a murder. *Perrin*, 149 F.4th 267, 282–83 (3d Cir. 2025), *cert. denied sub nom. Montgomery v. United States*, No. 25-7165, 2026 WL 3053456 (U.S. Oct. 13, 2026), and *cert. denied*, No. 25-7146, 2026 WL 3053460 (U.S. Oct. 13, 2026). The defendant was convicted and sentenced to life in prison and on appeal alleged that he was unlawfully sentenced since the killing of the witness was a manslaughter rather than a murder, and thus that a life sentence was not available by statute. The Court of Appeals upheld the life sentence and noted that "[t]he intention behind the killing is therefore an element of the crime defined in subsection 1512(a)(1)(C).[] Killing a witness to prevent her from talking to law enforcement in violation of subsection 15(a)(1)(C) encompasses an unlawful killing with malice aforethought, in other words, murder." *Id*. at 283.

As was the case here, the Court of Appeals additionally noted that the district court's instructions in *Perrin* on a different count, which charged the defendant with a violation of 18 U.S.C.§ 924(j) in relation to the killing of the same victim witness, included the definition of murder as "a willful, deliberate, malicious, premeditated killing." *Id*. at 284. In the instant case, the defendant was convicted of this offense as well. The Court of Appeals held in *Perrin* that the jury's verdict on this count established "that it found the killing of [the victim] constituted first-degree murder," and "[b]ecause this jury found the necessary elements of first-degree murder beyond a reasonable doubt" the defendant was not entitled to relief. *Id*.

Here, as in *Perrin*, the Court instructed the jury on the elements of first-degree murder during its charge. Unlike in *Perrin*, however, here the jury first had to consider a conspiracy

charge under 1512(k), which by its definition had to include premeditation—advance discussion, planning, and agreement among the defendants—in the killing of victim witness A.G. The jury had to find that the killing of A.G. was premeditated, and was thus a first-degree murder, in order to convict the defendants of conspiring to commit that killing as charged in Count 4. Like in *Perrin*, here the jury clearly "found the necessary elements of first-degree murder beyond a reasonable doubt" when it convicted McCracken and Muse of conspiring to commit the crime of tampering with a witness by murder. *See id*. at 283. The jury's finding in that regard carries into Count 5, as well.

Lastly, defendants' argument that a separate jury interrogatory was required is also meritless. No defendant asked that there be one, and no defendant objected to the jury instruction as it was given by the Court. Neither defendant points to precedent that would require such interrogatories.

### D. Muse's Objection Regarding Counts 61 and 62

The government has filed a motion to dismiss Counts 61 and 62. DI 660. If granted, this objection will be rendered moot.

### E. Muse's Objection to the Failure of the PSR to Assign Roles to Each Defendant

The PSR's treatment of the relative roles of the various defendants is helpful for the Court's consideration of specific guideline provisions, and in particular, role adjustments; it otherwise does not limit the defendants from arguing their relative culpability, and it does not preclude the Court from considering that fact in crafting a sentence. Here, the PSR notes that Muse is ineligible for any downward adjustment based upon his role in the offenses.

Further, of the five defendants who proceeded to trial, Muse participated in the second most-number of crimes charged as overt acts or substantive crimes. McCracken participated in

both murders plus 20 additional carjackings; Muse participated in both murders plus 10 additional carjackings; Abdul-Hakim participated in one murder plus 5 additional carjackings; Fosque participated in 10 carjackings; and Coleman participated in 4 charged carjackings (and a 5th, based on trial evidence, as well).

Muse argues that because he was away in North Carolina during part of the conspiracy, that he was somehow less involved—the numbers show otherwise. Apart from McCracken, Muse is the only other defendant to have participated in two murders. Additionally, Muse was involved in the carjacking of A.T., the woman walking up her steps on February 4, 2022 (Group M), and the shooting of A.K. in the hand and foot on February 10, 2022 (Group N). Further, in all but one of the carjackings in which he personally participated, Muse was out of the car sticking a gun in someone's face.

Notably, even after McCracken shot at A.T. on February 4, 2022, Muse eagerly went out again with the carjacking crew on February 6, 2022. Not only was that the day that G.B. was murdered by the group, but an hour and a half before the murder, Muse was part of the attempted carjacking of B.C. at 7501 Elmwood. Muse was physically out of the car when the three carjackers approached B.C., and the carjackers pistol-whipped this victim in the face, causing a lasting eye injury. Then, Muse again was out of the car during the murder of G.B. McCracken pulled the trigger, but Muse was equally involved in the carjacking, and he, along with McCracken and Abdul-Hakim, left G.B. dying in his mother's driveway with no concern for what clearly were mortal wounds.

Despite the fact that the group knew that G.B. had died from his gunshot wounds, Muse still went out again with McCracken and Akubu on February 10, 2022, when they carjacked and shot A.K. in the hand and the foot. Either McCracken or Muse pulled that trigger, but even if it

was McCracken, Muse was certainly aware that people could be shot and/or killed during these carjackings, and that did not give him any pause.

The next night, February 11, 2022, Muse went out again with McCracken and Akubu, stalking and then carjacking J.S. in King of Prussia. In line with the prior violence of this conspiracy, Muse then conspired to kill A.G. the day after that, February 12, 2022. Even after the second murder, as his messages show, Muse was still trying to commit more crimes with Akubu and McCracken.

Muse was a vital and violent member of this conspiracy. Also, the evidence shows that even when Muse was in North Carolina, McCracken was keeping him involved. Muse's portrayal of himself in his sentencing memorandum of some naïve hanger-on is offensive and not born out by the trial evidence. Muse was instead McCracken's most loyal friend, and one of the most violent members of the conspiracy. The evidence showed that if Muse had not been in North Carolina for a month and a half, he likely would have been present committing the carjackings in December and January of 2022, as well. Even being away from Philadelphia for that extended period of time, Muse still managed to participate in the second-most number of crimes of the five defendants who proceeded to trial.

### F. Muse's Remaining Objections

Muse raises multiple objections to the PSR's factual statements. The PSR hews closely to the jury verdict, and Muse can, and doubtless will make his contrary arguments more appropriately to the Court at sentencing and in any post-trial litigation. However, the trial evidence supports the facts as described in the PSR, including the PSR's summary of the murder of locksmith A.G.

Muse also objects to including victim statements in the PSR from carjackings in which

Muse did not physically participate. However, Muse was convicted of conspiracy, and thus, the statements of any victims of this conspiracy are relevant to Muse at his sentencing.

Muse also objects to the mention of his involvement in a gang. The government notes that this does not impact the guidelines; in any event the assigned case agent is prepared to address the evidence of that allegation, if necessary.

## IV. THE 18 U.S.C. § 3553(A) FACTORS

A thorough consideration of all of the sentencing factors set forth in 18 U.S.C. § 3553(a) suggests that the most appropriate sentence in this case is one in the guideline range calculated by the Court at the sentencing hearing.

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 128 S. Ct. 586, 596 (2007). Thus, the Sentencing Guidelines remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses.

This Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been

found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).[3]

### A. Consideration of the 3553(a) Factors

#### ***1. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant***

The crimes committed by Amin Muse and his confederates were brutal and violent in the extreme, as described in detail above. The testimony at trial showed that Muse eagerly and aggressively participated in these extraordinarily vicious attacks on innocent and defenseless victims. He participated directly in the attack on G.B., who was shot and killed. Muse was unfazed by the killing. He was equally remorseless in his planning of the murder of A.G, to prevent the possibility that A.G. might cooperate with law enforcement.

#### ***2. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense***

The enormous damage done by Amin Muse and his confederates can be seen in the wrenching victim impact statements presented in the PSR at ¶¶ 63-128, as well as in additional letters and impact testimony the government anticipates presenting at the sentencing hearing. The victim impact statements are difficult to read. The families of the deceased told of incalculable loss and continuing grief. The surviving victims told stories of acute and sometimes

[3] Further, the "parsimony provision" of Section 3553(a) states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." The Third Circuit has held that "district judges are not required by the parsimony provision to routinely state that the sentence imposed is the minimum sentence necessary to achieve the purposes set forth in § 3553(a)(2). . . . '[W]e do not think that the "not greater than necessary" language requires as a general matter that a judge, having explained why a sentence has been chosen, also explain why some lighter sentence is inadequate.'" United States v. Dragon, 471 F.3d 501, 506 (3d Cir. 2006) (quoting United States v. Navedo-Concepcion, 450 F.3d 54, 58 (1st Cir. 2006)).

permanent physical injuries, lasting emotional damage, and ongoing financial devastation. The recommended guideline sentence of life plus 660 months is harsh, but rightly so. A guidelines sentence is more than warranted, and it is necessary to reflect the seriousness of the lives ended or permanently damaged by the defendant and his confederates through their crimes. It is a just penalty.

Muse requests an extreme downward departure—from his guidelines of life plus 660 months to only 700 months total, which would have him serve well under fifty percent of his guideline range. Yet, Muse's actions throughout this conspiracy cannot justify any departure, let alone one so severe. Muse begs this Court for mercy when he showed his victims none.

***3. The Need to Afford Adequate Deterrence to Criminal Conduct, and to Protect the Public from Further Crimes of the Defendant***

As discussed, the crimes of the defendant and his confederates were unique in their callous brutality and frequency. A guideline sentence of life plus 660 months is necessary to reflect society's strongest warning that those engaging in such extraordinary violence will be removed permanently from society. Muse's actions in this case show that he is an immense and continuing danger to the public.

***4. The Need to Provide the Defendant with Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner***

The PSR does not reflect a need for treatment. Of course, he can benefit from furthering his education, and he can do so in federal prison. To the extent he needs drug treatment, he can also receive such treatment in federal prison.

***5. The Guidelines and Policy Statements Issued by the Sentencing Commission***

The recommended sentence complies with the guidelines.

***6. The Need to Avoid Unwarranted Sentence Disparities among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct***

The crimes committed by the defendants in this case are unique in their scope and quantity. That said, a guideline sentence provides consistency across cases.

***7. The Need to Provide Restitution to Any Victims of the Offense***

There is required restitution due in this case. The government will provide a requested restitution amount, to the extent possible, in advance of sentencing.

**CONCLUSION**

In light of all the above, the Court should impose a sentence within the advisory guideline range of life plus 660 months.

Respectfully submitted,

DAVID METCALF
*United States Attorney*

/s/ *Joseph A. LaBar*
JOSEPH A. LaBAR
*Assistant United States Attorney*

/s/ *Katherine Shulman*
KATHERINE SHULMAN
*Assistant United States Attorney*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the within Government's Sentencing Memorandum has been served this date via ECF to the following defense counsel:

Brian Zeiger, Esq.
1500 John F. Kennedy Boulevard, Two Penn Center S#620a
Philadelphia, PA 19102
zeiger@levinzeiger.com
*Attorney for Amin Muse*

/s/ *Joseph A. LaBar*
JOSEPH A. LaBAR
*Assistant United States Attorney*

/s/ *Katherine Shulman*
KATHERINE SHULMAN
*Assistant United States Attorney*

Date: October 20, 2026