**IN THE UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 24-3-05** |
| **KAVON COLEMAN** | : | |

# GOVERNMENT'S SENTENCING MEMORANDUM

## I. PROCEDURAL BACKGROUND

On July 24, 2024, a grand jury returned a 70-count Superseding Indictment against the defendants, Mikal McCracken, Amin Muse, Aleem Abdul-Hakim, Dean Fosque, Kavon Coleman, Amadou Moussa, and Davon Squire, arising from a large-scale carjacking conspiracy during which the conspiracy was responsible for approximately 60 gunpoint carjackings. Thirty of the carjackings (including the carjacking/murder) were charged in the Superseding Indictment, as both overt acts in support of the conspiracy and as substantive crimes. The crimes named in the Superseding Indictment involve: a carjacking where the victim was shot and killed; the murder of a witness; 30 additional gunpoint carjackings, including 7 more shootings where 3 victims were actually hit by gunfire during 4 of those 7 shootings (one victim was carjacked and shot twice); a slew of identity thefts; and a scheme to export carjacked and stolen cars for sale in Africa.

Kavon Coleman was charged in the Superseding Indictment as follows:

In Count 1 with Conspiracy in violation of 18 U.S.C.§ 371;

In Count 39 with Carjacking resulting in serious bodily injury and aiding and abetting in violation of 18 U.S.C. §§ 2119(2) and 2;

> In Count 41, 43, and 45 with using, carrying, and brandishing a firearm during and in relation to a crime of violence and aiding and abetting in violation of 18 U.S.C. § 924(c)(1)(A)(ii) and 2; and
>
> In Count 40, 42, and 44 with Carjacking and aiding and abetting in violation of 18 U.S.C. §§ 2119(1) and 2.

Trial for defendants McCracken, Muse, Abdul-Hakim, Fosque, and Coleman began on January 20, 2026, with jury selection, and included the testimony of over 100 witnesses during an 8-week period. On March 19, 2026, the jury returned a verdict finding all defendants guilty of all counts charged in the Superseding Indictment.

## II. OFFENSE CONDUCT: KAVON COLEMAN

The offense conduct is comprehensively summarized in the Presentence Report ("PSR") at ¶¶ 24 – 60. In sum, the defendants engaged in a long-term campaign of violent carjackings that victimized dozens of innocent people, leaving one dead; others wounded by gunfire (one twice, in the same leg, PSR ¶¶ 30, 36, 47); others fired upon; others beaten; and others pistol-whipped. These crimes left all the victims emotionally scarred and financially devastated. Additionally, a second man was murdered simply to eliminate the possibility that he might become a witness against the defendants. At trial, the Court heard testimony from many of the victims who suffered at the hands of the conspirators and often saw victims' first-hand reactions as captured on police body camera video. However, while the government presented testimony concerning thirty-one carjackings, including the murder, the investigation into the conspiracy showed that there were as many as 60 carjackings committed during the life of the conspiracy. PSR¶ 26.

Kavon Coleman became involved in the carjacking conspiracy in at least early 2022 after being invited by his friend Mikal McCracken. McCracken presented the opportunity, and Coleman excitedly participated. In fact, Coleman asked McCracken on numerous occasions to bring him along on more carjackings.

Coleman was charged in the Superseding Indictment with participating in four carjackings that occurred overnight between January 27 and January 28, 2022, however, trial evidence showed he likely also committed an earlier carjacking on January 18, 2022, as well.

At trial, the crimes listed in the Superseding Indictment were presented in Groups from A to N. Each group consisted of two to four events and/or crimes. Coleman was personally involved in Groups H (based on the trial evidence) and K. Those incidents in which Coleman personally participated will be described below chronologically.

**Group H**

On January 18, 2022, at 6:00 a.m., Fosque, McCracken, Akubu, and one other individual (likely Kavon Coleman, based on Akubu's statements and messages between McCracken and Coleman after the fact[1]) carjacked a 2020 Toyota RAV4 at gunpoint from D.H. at 24th Street and Park Towne Place in Philadelphia. The crew saw D.H.'s vehicle at a video store in Southwest Philadelphia and followed D.H. into Center City. D.H. pulled into a field by the Art Museum. Dean Fosque was driving the offender vehicle (a white Nissan Murano that Akubu got from Fosque's friend and Payless Burglary co-defendant, Douglas Tucker). Akubu, McCracken, and the other offender got out to commit the carjacking. During this carjacking, the defendants pulled in front of the victim's car, pointed guns at him, and forced him to the ground. The victim got up, ran, and McCracken and the other individual started firing at D.H. as he fled. Luckily, D.H. was not struck by gunfire and was able to run to a police station. [Counts 27 and 28.] *See* PSR ¶ 41.

**Group K**

[1] While Coleman was not charged specifically for this carjacking in the Superseding Indictment, the charging document made clear there were others involved during that crime, and the evidence presented at trial showed that Coleman was likely the fourth co-conspirator present during this crime. Accordingly, such evidence is appropriate to consider at sentencing.

In the late evening of January 27, 2022, in the early morning hours of January 28, 2022, McCracken, Coleman, Akubu, and Lee, committed a spree of four carjackings—first, of M.D. again, where they shot him again in the same leg; second, of a pharmacist who's car had been tracked using GPS; third, of man returning to his home in Southwest Philadelphia whose car ended up in the same shipping container with V.J.'s (from Group I); and fourth, of a man parking, whose car had a light brown interior ("peanut butter guts") and blue interior lights.

At the beginning of that evening, Akubu picked up McCracken, Coleman, and Lee, and the group drove within and outside of Philadelphia hunting for victims. The first carjacking in this spree of four occurred on January 27, 2022, at approximately 8:00 p.m., when McCracken, Coleman, Akubu, and Lee attempted to carjack a 2022 Toyota Highlander from M.D. (the same victim from December 19, 2021 - Counts 17 and 18) at gunpoint at 8400 Lyons Place in Philadelphia. During this carjacking, Akubu was driving, and he dropped off McCracken, Coleman, and Lee to commit the crime. McCracken had the FN Herstal model Five-seveN 5.7x28 mm caliber handgun (serial number 386311974) pistol (also later used in both murders), Coleman had a .40 caliber handgun, and Lee had a .9mm handgun.

Since the last time M.D. had been victimized by this group just over a month prior, he had undergone a bullectomy surgery to get McCracken's earlier bullet removed from his leg. The day of this second carjacking, M.D. had finally obtained a new vehicle, and he decided to park it about four miles away from where he had parked during the first carjacking. M.D. feared the carjackers might remember where he had previously parked, and he thought that if he parked there again, he could be victimized again. For that reason, M.D. parked far away and planned to take public transportation back.

As M.D. parked, he began to get a sense of déjà vu when he saw three masked men (McCracken, Coleman, and Lee) walking toward him. M.D. began to flee, and McCracken and Coleman starting shooting at M.D. (On the scene, police recovered seven FN fired cartridge casings, or "FCCs," one .40 caliber FCC, and a .9mm unfired live round of ammunition.) As M.D. was running away, he felt himself get shot again in the same leg in which he had previously been shot. He knew some vital part of his leg had been hit because he immediately had trouble continuing to run and stay upright. M.D. crawled under a parked car in a stranger's driveway and hid from the carjackers.

McCracken, Coleman, and Lee could not find M.D., who still had his car key on him, so they abandoned M.D.'s vehicle. Akubu picked them back up and they drove away. M.D. was so scared that even after he called 911, he would not come out from underneath the car where he was hiding. Police ultimately had to call him back to figure out where to find him. Police again had to rush M.D. to the hospital.

This time, M.D.'s shooting injury was even more severe, as the bullet had hit a nerve. Since the time of this second shooting, M.D. has had to undergo several surgeries and he still does not have full mobility in his foot, which has affected his ability to work. In fact, when he testified in February of 2026, he had just undergone another surgery and had to use crutches. [Count 39.] *See* PSR ¶ 47.

Less than an hour after the attempting carjacking and shooting of M.D., at approximately 8:55 p.m., McCracken, Coleman, Akubu, and Lee, committed an armed carjacking of a 2018 Land Rover from F.C. at 6731 Woodland Avenue in Philadelphia in the parking lot of a Rite Aid. Akubu had previously placed a tracker on this victim's car, and the crew waited for the victim, a Rite Aid Pharmacist, to finish his shift in order to carjack him. Akubu waited in his Camry, while

McCracken, Coleman, and Lee approached the victim. The victim was getting into this car when McCracken, Coleman, and Lee pointed guns at him, took his keys, and drove away in his car. This car was sold to Moussa, but it was subsequently recovered several days later in Yeadon. [Counts 40 and 41.] *See* PSR ¶ 48.

During this same spree, after the crew committed the carjacking of the pharmacist, they traveled to several other locations, including to the pharmacist victim's home to search for other cars or belongings. Additionally, the crew also traveled up to the Cirro Apartments in King of Prussia, because Akubu had previously placed a tracker on the Range Rover of a woman who lived in those apartments, J.S. McCracken, Muse, and Akubu would later carjack J.S. in King of Prussia about two weeks later.

After driving around and hunting for more victims, about four hours later, on January 28, 2022, around 2:40 a.m., Akubu, McCracken, Coleman, and Lee were in Akubu's Camry when they spotted F.A., a rideshare driver, driving his 2021 Toyota RAV4. They followed F.A. until he parked, and Akubu dropped off McCracken, Coleman, and Lee in the area of 1445 Robbins Street in Philadelphia. As the victim was parking, one of the carjackers approached him with a gun and demanded his keys. Then, the two other carjackers forced F.A. to the ground and searched him. They drove off in his car. This car was sold to Amadou Moussa, and it was intercepted and recovered in a shipping container in Norfolk destined for Niger (it was in the same container with V.J.'s car, the man from Yeadon wearing a reflective vest carjacked on January 25, 2022, in Group I). [Counts 42 and 43.] *See* PSR ¶ 49.

The group committed the fourth carjacking of that spree about an hour later. On January 28, 2022, at 3:38 a.m., McCracken, Coleman, Akubu, and Lee carjacked a 2021 Toyota Highlander, with a brown interior ("peanut butter guts") and blue internal lights, from M.B. at

2700 S. 69th Street in Philadelphia. M.B. was a rideshare driver who had just returned home from work and parked his car. Akubu dropped off McCracken, Coleman, and Lee, and the three approached M.B. and pointed guns at him while demanding his vehicle. During the carjacking, M.B. was pistol-whipped by one of the carjackers. The carjackers took M.B.'s car, and this vehicle was recovered the same day in Yeadon. [Counts 44 and 45]. *See* PSR ¶ 49.

After this spree, the crew sold F.C.'s Range Rover to Moussa. In order to get the payment for that car, Akubu traveled to North Carolina to a "Hawala" (unofficial means of getting funds from other individuals overseas) to collect payment on behalf of Moussa on January 29, 2022. Akubu returned to Philadelphia the same day, and he distributed proceeds to McCracken and Lee. McCracken then distributed money to Coleman. Once Coleman got paid, he posted the below photograph on Instagram in the early morning hours of January 30, 2022.



## Conversations About Other Carjackings

Besides the carjackings in which Coleman participated, McCracken also discussed other carjackings and shootings with Coleman, and Coleman continued to ask to participate in more carjackings.

For example, on February 2, 2022, the evening after the carjacking of F.F. of his Mercedes AMG on February 1, 2022, at 800 Delaware Avenue/1 Brown Street (Group L), McCracken had the following conversation with Coleman about that carjacking, police recovering the carjacked cars, Coleman getting a new gun, and Coleman wanting to go out carjacking with McCracken and the crew:

> **McCracken:** You ard [ok] ?
>
> **Coleman:** Yeah hbu [how about you]
>
> **McCracken:** Yeah the law cracked us for all the jawns we took last night smh [shaking my head]
>
> **Coleman:** They figured out the tuck spots ?
>
> **McCracken:** We had a fucking AMG
>
> **McCracken:** Only 1 , but we parked the AMG at the Telly [short for hotel, and this Mercedes was recovered at the A Loft hotel] and that shit got took
>
> **Coleman:** The two jwns we grabbed gone?
>
> **Coleman:** And damn [head smack emoji] I'm waiting for this range to come back in [referring to J.S.'s Range Rover in King of Prussia, which Coleman had seen when the crew checked on her car's tracker during Group K]
>
> **McCracken:** Yeah
>
> **Coleman:** And I got ah new gat ima go outside w [with]
>
> **Coleman:** Stop leaving me too bro [crying emoji, crying emoji, head smack emoji, punch emoji] I be bored ashit

> **McCracken:** My fault gang shit just been getting took like a mf [motherf*****] lately

Again, on February 4, 2022, about three hours after the carjacking and shooting of A.T., a woman going up her steps at 7605 Elmwood Avenue (Group M), McCracken bragged to Coleman about shooting at A.T. and her husband via text message, saying, "I just tagged sum gang I ain't even around , u good ?" and then referred to Coleman calling him a "hothead[.]" McCracken told Coleman, "Yk [you know] how this shit go gang . . . ." Coleman responded, "I seen u work, u scatted in a field" (referring to the carjacking of D.H. from January 18, 2022, that occurred in a field by the Art Museum in Philadelphia).

Later on February 4, 2022, McCracken and Coleman had the below conversation where Coleman and McCracken discussed Coleman coming out the next time they went carjacking:

> **McCracken:** "Ima call u next mission we out babyboy ik [I know] u ready for sum new cheese [money]
>
> **Coleman:** Whaaa, n***** stop leaving me , sn [say no more] yea I'm ready I be bored ashit
>
> **McCracken:** We might be out tonight ima hit you
>
> **Coleman:** Ard bet
>
> **McCracken:** If not tonight we out tomar

Later, on February 5, 2022, McCracken and Coleman had the following conversation where Coleman asked McCracken to take him out carjacking:

> **Coleman:** We outside tn [tonight] brudda?
>
> **McCracken:** Yeah
>
> **Coleman:** [unknown attachment]
>
> **McCracken:** we def can get one that ain't shit
>
> **Coleman:** Rd [ok] nbs [no bullsh**] bro

**McCracken:** Like how you bung on me [not answer the phone]

**Coleman:** My shit fucked up gang I'm in the crib now

**Coleman:** Yo bro

**McCracken:** Change of plans Brodie nbs [no bullsh**] , we prolly gotta wait till Monday to go out the law oss [on some shit] rn [right now]

On February 6, 2022, prior to the attempted carjacking of B.C. at 7501 Elmwood at 6:39 p.m. and the carjacking and murder of G.B. at 2118 Afton Street just after 8 p.m. (Group A), McCracken and Coleman had the following conversation about Coleman potentially joining the crew that night:

**McCracken** (4:45 p.m.): Wya [where you at]

**McCracken** (4:45 p.m.): Bout to pop out

**Coleman** (5:25 p.m.): I'm at the spot I jus got in

**McCracken** (5:25 p.m.): I'm already out here now gang ima Call you back . if we still out in like 3 hours ima call u

**McCracken** (5:25 p.m.): The bitch with the range was moving I had to rush [referring to J.S. from King of Prussia]

**Coleman** (5:26 p.m.): [head smack emoji]

**McCracken** (5:26 p.m.): U on 61st

**Coleman** (5:28 p.m.): Yeah, I was bending I jus got in I'm thinking N***** ain't pippin out till later

**Coleman** (5:28 p.m.): Poppin *

**McCracken** (5:28 p.m.): Rd ima hit you [call you]

**McCracken** (5:29 p.m.): We was gon pop out later but the bitch that we had the tracker on was downtown so we had a change of plans

**Coleman** (5:30 p.m.): It's coo, ima be here tho

On February 7, 2022, Coleman messaged McCracken about sharing their guns, saying, "When u come grab me today can u take me to get the ova gat," and "I can use this one fr [for real] but I wan use the ova one[.]"

Then, on February 10, 2022, in the early evening, prior to the carjacking of A.K. (Group N), Coleman and McCracken had the below conversation about potentially going out carjacking, the police recovering their carjacked cars, the car buyers not selling the cars fast enough, and Coleman indicating he was ready to go out carjacking again anytime:

**Coleman:** U Rey [ready] slide now or u busy, and we was supposed to

**McCracken:** Ik [I know] I ain't tell you the law took the JBS

**Coleman:** Oh Yeah u did, I'm teed u ah hotboy [crying emoji, head smack emoji]

**McCracken:** Bro them jawns just was sitting cuz the buyers was on some bs

**Coleman:** Smh [shaking my head], it's coo doe, I'm ready when ever u is

After the carjacking and shooting of A.K., who was shot in the hand and foot as he tried to run away in the area of the 7400 block of Torresdale Avenue (Group N), McCracken told Coleman about how he was meeting with the buyers of the carjacked car—messaging Coleman, "Meeting this buyer rn [right now]" and "Bro this was the jawn we already grabbed."

Then, in the morning on February 12, 2022, after the carjacking of J.S. and her seven-year-old daughter in King of Prussia during the evening of February 11, 2022 (Group N), McCracken and Coleman had the below conversation about that carjacking, how Coleman was not able to go out with them carjacking the previous night because of one of his girlfriend's birthdays, and that Coleman was ready to keep committing crimes now that the birthday was over:

**McCracken:** Wish you came out last night we grabbed the range

**Coleman:** Ik [I know] [head smack emoji] but it was my bitch bday

**Coleman:** I ain't bs tho we out for now one

**Coleman:** On

**Coleman:** That was my only event, I'm back to being on my guttery shit

As Coleman had gone with McCracken, Akubu, and Lee during the four-carjacking spree in Group K up to King of Prussia, Coleman was familiar with the Range Rover to which McCracken was referring.

McCracken and Coleman continued to talk about the conspiracy after that, and Coleman continued to ask to participate in more carjackings while McCracken continued to complain about the car buyers. On February 16, 2022, McCracken and Coleman had the below conversation:

**McCracken:** You Ard [ok] ?

**Coleman:** Yea when we outside

**McCracken:** When the buyers stop bsing

On February 19, 2022, Coleman messaged McCracken again to participate in more carjackings, saying, "U gotta lock me in w the missions when it's time brudda, n****s counting on u rn [right now]" and McCracken responded, "I got u[.]"

Akubu was arrested on February 18, 2022, and police recovered the FN handgun used in both murders and other carjackings, Akubu's cell phones, and numerous identifications from multitudes of carjacking victims. After Akubu's arrest and the subsequent press conference, on February 22, 2022, McCracken and Coleman had the below conversation:

**McCracken:** I'm wit n[****s]

**McCracken:** But that's me and bro situation

**McCracken:** N[****] they got everything

**McCracken:** The gun we used

**McCracken:** His jack [cell phone]

**Coleman:** Dh [dickhead]

**McCracken:** Everybody we robbed IDS

**McCracken:** Delete what you sent me on the gram

## Witness Intimidation

Not only did Coleman enthusiastically participate in violent carjackings, but he also tried to coerce his former girlfriend, A.D., not to cooperate with the investigation. Because Coleman used McCracken's phone during Group K to contact A.D. several times throughout the night and because Coleman used A.D.'s phone later to contact McCracken after those carjackings, Coleman understood that A.D.'s evidence could significantly link him to those crimes. Coleman harassed A.D. via phone calls and messages from prison to try to convince her not to talk to the FBI about him.

## Facts of Prior Federal Carjacking Conviction

Separate from the conspiracy at hand, Coleman was also charged federally with a separate carjacking from 2022, to which he pled guilty before the Honorable Juan R. Sánchez and was sentenced to 121 months of incarceration followed by 5 years of supervised release on May 22, 2025. That conviction is relevant here because it demonstrates what Coleman was doing with others at the same time as the conspiracy in the Superseding Indictment was ongoing.

Coleman's conviction is for the gunpoint carjacking of J.M., a 22-year-old woman, of her black 2017 Chevrolet Impala on February 17, 2022, around 5:13 p.m. at 3300 Fairmount Avenue in Philadelphia, PA, along with an unindicted accomplice. This was just over two weeks after

Coleman's participation in the four carjackings (including the second shooting of M.D.) in Group K, and this crime coincided with Coleman continuing to ask McCracken to take him out on even more carjackings.

In the moments proceeding the February 17, 2022 carjacking, J.M. was sitting in the passenger side of her car while waiting for a food order from FairFoods at 3300 Fairmount Avenue (the same store outside which G.C. had been carjacked by Akubu and Fosque on October 24, 2021) after she finished work. Coleman and a second male approached, holdings guns, while J.M. was sitting in the passenger side of her car with her door open. The unindicted conspirator walked to the passenger side, pointed a gun at her, demanded her keys, and ordered her out of the car. Coleman got in the driver's seat of J.M.'s car. The victim got out and the males fled in her car. (J.M. later identified Coleman as one of the carjackers in a photo array.)

The next day, February 18, 2022 (which also happened to be the day Akubu was arrested), at approximately 4:20 p.m., Philadelphia police officers were on the 1800 block of South 58th Street when they saw a different car—a grey Infiniti G35 that had also been carjacked the previous day. That Infiniti had been carjacked from victim L.A.D. near 1000 South 51st Street around 4:00 p.m. on February 17, 2022, about an hour before J.M. was carjacked (the investigation into that earlier carjacking of L.A.D. remains open). The officers recognized the Infiniti because they had responded to L.A.D.'s carjacking report the day prior. Accordingly, the officers attempted to stop the Infiniti, but it fled, eventually crashing into another occupied truck that was traveling down the 5800 block of Kingsessing Avenue.

The officers then saw three males, including Coleman, flee from the car while the car was still in motion. The abandoned Infiniti then rolled onto the curb and crashed into a tree on Kingsessing Avenue. Detectives ultimately located a key fob inside of L.A.D.'s Infiniti from

which Coleman and the other males fled. Detectives were able to determine that it was J.M.'s Chevrolet Impala key fob, which she had given to the carjackers at gunpoint on February 17, 2022.

Additional officers responded and located Coleman and a second male (A.A., who was 17 years old at that time). In Coleman's flight path, officers also located the hoodie worn during J.M.'s carjacking (as seen on surveillance video) and a black and green Polymer80 PF940C 9mm handgun with no serial number, which had a magazine inserted but no ammunition (this was a ghost gun, or a gun manufactured without a serial number, making it difficult to trace). Both the hoodie and the ghost gun were later linked to Coleman by DNA evidence. A.A. also had a gun in his waistband.

On February 23, 2022, J.M.'s carjacked Chevrolet Impala was located and recovered on the 7800 block of Arlington Avenue in Upper Darby, Pennsylvania, on the block where Coleman's then-girlfriend, A.D., lived at the time. DNA analysis showed a probability consistent with Coleman's DNA being inside of J.M.'s Impala.

The local case for J.M.'s carjacking was initially dismissed, and Coleman was released from local custody. However, the case was refiled, and a local preliminary hearing was listed for J.M.'s carjacking on November 28, 2023. Coleman failed to appear at that hearing, and the local court issued a bench warrant.

**<u>January 4, 2024 Arrest, Attempted Flight, and Gun Recovery</u>**

Coleman was federally indicted for charges based on J.M.'s carjacking on December 7, 2023. Coleman was not residing at his home of record and was still in bench warrant status from the November 28, 2023 failure to appear, so the FBI conducted physical surveillance and used technological investigative tactics to determine where Coleman was staying (at the home of one

of his other girlfriends, S.K.). On January 4, 2024, the FBI Violent Crimes Task Force and the FBI SWAT team went to the home they had determined Coleman was at based on their extensive investigation.

When the FBI announced their presence, Coleman attempted to flee. Coleman climbed out a third-floor window onto a roof, presumably to jump to the ground below and escape. However, FBI aerial support spotted Coleman on the roof, and agents on the ground communicated to Coleman that they saw him on the roof. Coleman then climbed back through the window and returned inside of the building. The FBI then arrested Coleman.

During the ensuing search of the house, the FBI recovered a firearm under the bed in the room where they also located Coleman's ID. The firearm was a .40 S&W caliber Glock pistol, model 22, with serial number BSRB658, and it had a Glock switch, which allows the gun to fire automatically.

A search of Coleman's Instagram revealed photos of the green and black ghost gun used in J.M.'s carjacking, as well as photos of what appeared to be of the .40 caliber Glock pistol with the switch recovered by the FBI on January 4, 2024.

## III. SENTENCING CALCULATION

### A. Statutory Maximum and Mandatory Minimum Sentences

The PSR accurately lists the statutory maximum and mandatory minimum at sentences as follows:

Count 1: The maximum term of imprisonment is five years. 18 U.S.C. § 371.

Count 39: The maximum term of imprisonment is 25 years count. 18 U.S.C. § 2119(2).

Count 41, 43, and 45: The minimum term of imprisonment is seven years, and the maximum term is life, per count. 18 U.S.C. § 924(c)(1)(A)(ii).

Count 40, 42, and 44: The maximum term of imprisonment is 15 years per count. 18 U.S.C. § 2119(1).

The total statutory maximum sentence is thus life in prison, with a mandatory minimum of 252 months imprisonment consecutive, five years' supervised release, a $2,000,000 fine, and a $800 special assessment. PSR ¶ 212, 215, 220, and 221.

**B. Sentencing Guidelines Calculation**

The government agrees with the calculations presented in the PSR; that is, that the defendant is assigned to criminal history category III, offense level 33; that Counts 41, 43, and 45 require at least an 84-month mandatory minimum term of imprisonment per count, or 252 months, which shall be imposed consecutively to any other term of imprisonment, pursuant to 18 U.S.C. § 924(c)(1)(D)(ii); and thus that the effective guideline imprisonment range is 420-462 months. PSR¶ 212.

Additionally, regarding the other federal sentence Coleman is serving, the three new 924(c) convictions (mandatory minimum of 252 months) must run consecutive to that other sentence. However, this Court has discretion to run any remaining part of Coleman's sentence consecutively, concurrently, or partially concurrently with his other federal sentence. PSR¶ 213.

The government recommends a sentence within the guidelines range of 420-462 months of incarceration, to be served wholly consecutive to the federal sentence he is already serving for the unrelated armed carjacking.

**C. Defendant's PSR Objections**

The defendant objects to the inclusion of crimes in which Coleman was not directly involved in his PSR. As the defendant was found guilty of conspiracy, these crimes are all appropriately included. Further, the defendant's messages and the trial evidence show that

Coleman's involvement extended beyond just the crimes in Group K. The government requests this objection be overruled.

Further, the defendant objects to his guideline range, and argues that he should be given a four-point deduction in all of the crime offense levels as a minimal participate pursuant to USSG §3B1.2(a). This objection runs contrary to all of the evidence presented at trial. None of the defendants who proceeded to trial were minimal participants. Specifically, Coleman played an integral role in every crime in which he participated. In fact, Coleman was always one of the offenders out of the car sticking a gun in someone's face, and in fact, he was one of the shooters during the second shooting of M.D. during Group K on January 27, 2022. The government requests this objection be overruled.

## IV. <u>THE 18 U.S.C. § 3553(A) FACTORS</u>

A thorough consideration of all of the sentencing factors set forth in 18 U.S.C. § 3553(a) suggests that the most appropriate sentence in this case is one in the guideline range calculated by the Court at the sentencing hearing.

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 128 S. Ct. 586, 596 (2007). Thus, the Sentencing Guidelines remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses.

This Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the

offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).[2]

### A. Consideration of the 3553(a) Factors

#### *1. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant*

The crimes committed by this defendant and his confederates were brutal and violent in the extreme. The testimony at trial showed that Kavon Coleman became involved in the carjacking conspiracy in at least early 2022 after being invited by his friend Mikal McCracken. Coleman's involvement in Group K was especially serious. Coleman and McCracken shot at victim M.D. because he ran from them, permanently injuring his leg and changing his life forever. Then, when they could not find M.D. to take his keys, the group went out and did three more carjackings—carjacking a pharmacist leaving his job in the parking lot of the Rite Aid; the man who was returning from work whose car ended up in a shipping container; and the man

[2] Further, the "parsimony provision" of Section 3553(a) states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." The Third Circuit has held that "district judges are not required by the parsimony provision to routinely state that the sentence imposed is the minimum sentence necessary to achieve the purposes set forth in § 3553(a)(2). . . . '[W]e do not think that the "not greater than necessary" language requires as a general matter that a judge, having explained why a sentence has been chosen, also explain why some lighter sentence is inadequate.'" *United States v. Dragon*, 471 F.3d 501, 506 (3d Cir. 2006) (quoting *United States v. Navedo-Concepcion*, 450 F.3d 54, 58 (1st Cir. 2006)).

whose car had "peanut butter guts," whom the carjackers pistol-whipped in the face. The group also went to the pharmacist's house that night, presumably to potentially commit further crimes against him. They also stalked J.S.'s Range Rover by going to her apartment building in King of Prussia in an attempt to find a good opportunity to carjack her of her coveted vehicle.

McCracken presented the opportunity, and Coleman excitedly participated. In fact, Coleman asked McCracken on numerous occasions to bring him along on more carjackings. Coleman also repeatedly intimidated a witness against him, A.D., the mother of his child. In addition to his involvement with these defendants, Coleman separately committed an additional armed carjacking within the same time frame of a young woman, a crime for which he was convicted in this district and is serving a sentence. A guideline sentence, served consecutively to that unrelated sentence, is warranted.

#### 2. *The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense*

The enormous damage done by the defendant and his confederates can be seen in the wrenching victim impact statements presented in the PSR at ¶¶ 63-120. They are difficult to read. The families of the deceased told of incalculable loss and continuing grief. The surviving victims told stories of acute and sometimes permanent physical injuries, lasting emotional damage, and ongoing financial devastation—including of M.D., whose lasting shooting injury Coleman was directly involved in inflicting. The recommended guideline sentence of 420-462 months, to be served consecutively to the defendant's present term, is harsh, but warranted and necessary to reflect the seriousness of the lives permanently damaged by the defendant and his confederates through their crimes. It is a just penalty.

### *3. The Need to Afford Adequate Deterrence to Criminal Conduct, and to Protect the Public from Further Crimes of the Defendant*

As discussed, the crimes of the defendant and his confederates were unique in their callous brutality and frequency. A guideline sentence within the guidelines range of 420 to 462 months' incarceration is necessary to reflect society's strongest warning that those engaging in such extraordinary violence will be sternly punished and removed from society for a substantial period. Coleman's actions in this case show that he is an immense and continuing danger to the public.

### *4. The Need to Provide the Defendant with Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner*

The defendant reports a history of drug use, so to the extent he needs drug treatment, should he elect to do so, he can be treated while serving a sentence in BOP. The PSR does not reflect a need for any other treatment.

### *5. The Guidelines and Policy Statements Issued by the Sentencing Commission*

The recommended sentence complies with the guidelines.

### *6. The Need to Avoid Unwarranted Sentence Disparities among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct*

The crimes committed by the defendants in this case are unique in their scope and quantity. That said, a guideline sentence provides consistency across cases.

### *7. The Need to Provide Restitution to Any Victims of the Offense*

There is required restitution due in this case. The government will provide a requested restitution amount, to the extent possible, in advance of sentencing.

## V. CONCLUSION

In light of all the above, the Court should impose a sentence within the advisory guideline range of 420 to 462 months' incarceration, followed by five years of supervised release, to be served consecutively to his present term.

Respectfully submitted,

DAVID METCALF
*United States Attorney*

/s/ *Joseph A. LaBar*
JOSEPH A. LaBAR
*Assistant United States Attorney*

/s/ *Katherine Shulman*
KATHERINE SHULMAN
*Assistant United States Attorney*

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the within Government's Sentencing Memorandum has been served this date via ECF to the following defense counsel:

Terri Pawelski, Esquire
123 South Broad Street, Suite 2800
Philadelphia, PA 19109
tpawelski@saxtonstump.com
*Attorney for Kavon Coleman*

/s/ *Joseph A. LaBar*
JOSEPH A. LaBAR
*Assistant United States Attorney*

/s/ *Katherine Shulman*
KATHERINE SHULMAN
*Assistant United States Attorney*

Date: October 22, 2026